BENJAMIN B. WAGNER
United States Attorney
ROSANNE L. RUST
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

**SEALED**

**FILED**

AUG 1 0 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
           DEPUTY CLERK

Attorneys for Plaintiff
United States of America

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR SEARCH WARRANT CONCERNING:

4901 Little Oak Lane, Apartment #185
Sacramento, CA 95841

CASE NO.  2:14-SW-0361-KJN

[PROPOSED] ORDER RE: REQUEST FOR FILING
A REDACTED VERSION OF SEARCH
WARRANT MATERIALS

Upon application of the United States of America and good cause having been shown,

IT IS HEREBY ORDERED that the government is allowed to file a redacted version of the

search warrant affidavit before the search warrant, application and affidavit are unsealed.

DATED:  _8 - 10 - 2015_

Hon. Edmund F. Brennan
United States Magistrate Judge

1

SEALED

AD 106 (Rev. 5/85) Affidavit for Search Warrant

**ORIGINAL
FILED**

# United States District Court

JUN 2 3 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
_____
DEPUTY CLERK

**EASTERN** _____ **DISTRICT OF CALIFORNIA**

In the Matter Of the Search of
(Name, address or brief description of person or property to be searched)

4901 Little Oak Lane, Apartment #185,
Sacramento, CA 95841

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

**CASE NUMBER:**

2: 1 4 - SW - 0 3 6 1   KJN

| **Detective Ryan Smith** |
| being duly sworn depose and say: |

I am a(n) _____ **Special Deputy United States Marshal** _____ and have reason to believe
Official Title

that ☐ on the person of or   ☒ on the premises known as (name, description and/or location)

**See Attachment A**

in the   **Eastern** _____ District of   **California** _____

there is now concealed a certain person or property, namely (describe the person or property)

**See Attachment B**

which is (give alleged grounds for search and seizure under Rule 41(c) of the Federal Rules of Criminal Procedure):
"Evidence of a crime, contraband, fruits of crime, or other items illegally possessed."

in violation of Title   **18** _____   United States Code, Section(s)   **2252** _____

The facts to support the issuance of a Search Warrant are as follows:

**See Attached Affidavit**

Continued on the attached sheet and made a part hereof.   ☒ Yes   ☐ No

Signature of Affiant

Sworn to before me, and subscribed in my presence

**June 23, 2014** _____   at   **Sacramento, California** _____
Date                                    City and State

**Hon. Kendall J. Newman, U.S. Magistrate Judge**
Name and Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Ryan Smith, being duly sworn, depose and state:

1. I am a Detective with the Sacramento County Sheriff's Department (SSD), presently assigned to the Sacramento Internet Crimes Against Children (ICAC) Task Force. I have been assigned to the Sacramento ICAC Task Force since January 2014. I have been employed by the SSD since January 1999. In January 2014, I was cross designated as a Special Deputy United States Marshal. As part of my daily duties as a Detective, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2251 and 2252. I have received training in the area of child pornography and child exploitation and as part of my duties have observed and reviewed numerous examples of child pornography and visual depictions of minors engaged in sexually explicit conduct (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. I have attended numerous courses in the investigation of child sexual exploitation, child pornography, and online child sexual exploitation. In the course of my duties I have been the investigating officer and Affiant of over 10 applications for search warrants relating to child pornography investigations.

2. I also have provided instruction to both law enforcement and civilians in the area of Internet security, online child exploitation, as well as social networking sites. I have received training in the areas of computers and computer forensics and I also have a certificate from the Robert Presley Institute of Criminal Investigation.

3. This Affidavit is made in support of an application for a warrant to search the entire premises located at **4901 Little Oak Lane, Apartment #185, Sacramento, CA 95841** (the "SUBJECT PREMISES"). The SUBJECT PREMISES to be

1  searched is more particularly described in Attachment "A" of this affidavit. The

2  search is to include all rooms, attics, basements, and all other parts therein, and

3  surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached

4  or unattached, located on the premises at **4901 Little Oak Lane, Apartment**

5  **#185, Sacramento, CA 95841**. In addition, because I am aware that it is common

6  practice for persons involved in the trafficking of child pornography to hide and

7  transport child pornographic materials and/or their instrumentalities in vehicles, I

8  request that the search warrant authorize the search of vehicles located at or near

9  the residence which fall under the dominion and control of the person or persons

10  associated with said residence. The search of these vehicles is to include all internal

11  and external compartments and all containers that may be associated with the

12  storage of child pornographic materials or their instrumentalities contained within

13  the aforementioned vehicles.

14  4.  The purpose of this application is to seize evidence of violations of 18 U.S.C. § 2252

15  (a) (4) (B), which makes it a crime to knowingly possess matter containing any

16  visual depiction that has been mailed, or shipped or transported using any means or

17  facility of interstate or foreign commerce, or in or affecting interstate or foreign

18  commerce, or which was produced using materials which have been mailed or so

19  shipped or transported, by any means including by computer, if the production of

20  such visual depiction involved the use of a minor engaging in sexually explicit

21  conduct, and such visual depiction was of such conduct; 18 U.S.C. §§ 2252 (a) (2),

22  which makes it a crime to knowingly receive or distribute any visual depiction using

23  any means or facility of interstate or foreign commerce, or that has been mailed, or

24  shipped or transported in or affecting interstate or foreign commerce, or which

25  contains materials which have been mailed, shipped or transported in interstate or

26  foreign commerce, by any means including by computer, where the producing of

27  such visual depiction involved the use of a minor engaging in sexually explicit

28  conduct, and such visual depiction was of such conduct; and 18 U.S.C. § 2252 (a) (1)

1  and (b)(1), which makes it a crime to knowingly attempt to transport or ship using
2  any means or facility of interstate or foreign commerce, or in or affecting interstate
3  or foreign commerce by any means, including by computer or mails, any visual
4  depiction where the producing of such visual depiction involved the use of a minor
5  engaging in sexually explicit conduct, and such visual depiction is of such conduct.
6  5. I am familiar with the information contained in this Affidavit based upon my
7  experience and training, my conversations with other law enforcement officers who
8  have engaged in numerous investigations involving child pornography, and the
9  investigation I have conducted.
10  6. Because this Affidavit is being submitted for the limited purpose of securing a
11  search warrant, I have not included each and every fact known to me concerning
12  this investigation. I have set forth only those facts that I believe are necessary to
13  establish probable cause to believe that evidence of violations of 18 U.S.C. § 2252
14  are located at the SUBJECT PREMISES and within a computer and related
15  peripherals, and computer media found at the SUBJECT PREMISES. Where
16  statements of others are set forth in this Affidavit, they are set forth in substance
17  and in part.
18  7. The investigation has revealed that presently located at the residence known as
19  **4901 Little Oak Lane, Apartment #185, Sacramento, CA 95841**, and further
20  described in Attachment A of this Affidavit, is a computer or computers being
21  utilized to store, and make available for distribution via the Internet, images and/or
22  movie files depicting child pornography.
23
24  **Definitions**
25  8. "Child Pornography" includes the definition found at 18 U.S.C. § 2256(8), and is any
26  visual depiction of sexually explicit conduct where (a) the production of the visual
27  depiction involved the use of a minor engaged in sexually explicit conduct, (b) the
28  visual depiction is a digital image, computer image, or computer-generated image

1  that is, or is indistinguishable from, that of a minor engaged in sexually explicit

2  conduct, or (c) the visual depiction has been created, adapted, or modified to appear

3  that an identifiable minor is engaged in sexually explicit conduct.

4  9. As used in this affidavit, "child erotica" means materials or items that are sexually

5     arousing to certain individuals but that are not in and of themselves obscene or do

6     not necessarily depict minors in sexually explicit poses or positions. Such material

7     may include non-sexually explicit photographs (such as minors depicted in

8     undergarments in department store catalogs or advertising circulars), drawings, or

9     sketches, written descriptions/stories, or journals.

10 10. "Visual depictions" include undeveloped film and videotape, and data stored on

11     computer disk or by electronic means, which is capable of conversion into a visual

12     image. See 18 U.S.C. § 2256(5).

13 11. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

14 12. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse,

15     including genital-genital, oral-genital, genital-anal, or oral-anal, whether between

16     persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or

17     masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any

18     persons. See 18 U.S.C. § 2256(2).

19

20 **The Internet and Definitions of Technical Terms Pertaining to Computers**

21 13. As part of my training, I have become familiar with the Internet (also commonly

22     known as the World Wide Web), which is a global network of computers[1] and other

23     electronic devices that communicate with each other using various means, including

24     standard telephone lines, high-speed telecommunications links (e.g., copper and

25

26 _____

   [1] The term "computer" is defined by 18 U.S.C. § 1030 (e) (1) to mean "an electronic, magnetic,
   optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or

27 storage functions, and includes any data storage facility or communications facility directly related to or
   operating in conjunction with such device, but such term does not include an automated typewriter or

28 typesetter, a portable hand held calculator, or other similar device."

1    fiber optic cable), and wireless transmissions including satellite. Due to the
2    structure of the Internet, connections between computers on the Internet routinely
3    cross state and international borders, even when the computers communicating
4    with each other are in the same state. Individuals and entities use the Internet to
5    gain access to a wide variety of information; to send information to, and receive
6    information from, other individuals; to conduct commercial transactions; and to
7    communicate via electronic mail ("e-mail"). An individual who wants to use Internet
8    e-mail must first obtain an account with a computer that is linked to the Internet
9    (through a university, an employer, or a commercial service such as an "Internet
10   Service Provider" or "ISP" [see definition of "Internet Service Provider" below]).
11   Once the individual has accessed the Internet, that individual can use Internet mail
12   services, including sending and receiving e-mail. In addition, the individual can
13   visit web sites (see definition of "web sites" below), and make purchases on the web
14   sites.

15   14. Set forth below are some definitions of technical terms, used throughout this
16      Affidavit, and in Attachments A, B, and C, hereto, pertaining to the Internet and
17      computers more generally.

18          a. Client/Server Computing: Computers on the Internet are identified by the
19             type of function they perform. A computer that provides resources for
20             other computers on the Internet is known as a server.  Servers are known
21             by the types of service they provide; that is, how they are configured. For
22             example, a web server is a machine that is configured to provide web
23             pages to other computers requesting them.. A client computer is a
24             computer on the Internet that is configured to request information from a
25             server configured to perform a particular function. For example, if a
26             computer is configured to browse web pages and has web page browsing
27             software installed, it is considered a web client.

28

b. <u>Compressed file</u>: A file that has been reduced in size through a compression algorithm to save disk space. The act of compressing a file will make it unreadable to most programs until the file is uncompressed.

c. <u>Computer system and related peripherals, and computer media</u>: As used in this Affidavit, the terms "computer system and related peripherals, and computer media" refer to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation equipment, digital cameras, scanners, in addition to computer photographs, and other visual depictions of such Graphic Interchange formats, including but not limited to, JPG, GIF, TIF, AVI, and MPEG.

d. <u>Digital device</u>: includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips; and security devices.

e. <u>Domain Name</u>: Domain names are common, easy to remember names associated with an Internet Protocol address (defined below). For example, a domain name of "<u>www.usdoj.gov</u>" refers to the Internet Protocol address of 149.101.1.32.

f.  Hash value: A mathematical algorithm generated against data to produce a numeric value that is representative of that data. A hash value may be run on media to find the precise data from which the value was generated. Hash values cannot be used to find other data.

g.  Image or copy: An accurate reproduction of information contained on an original physical item, independent of the electronic storage device. "Imaging" or "copying" maintains contents, but attributes may change during the reproduction.

h.  Internet Service Providers (ISPs) and the Storage of ISP Records: Internet Service Providers are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and personal password. ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing

1    information, account access information (often times in the form of log
2    files), e-mail communications, information concerning content uploaded
3    and/or stored on or via the ISP's servers, and other information, which
4    may be stored both in computer data format and in written or printed
5    record format. ISPs reserve and/or maintain computer disk storage space
6    on their computer system for their subscribers' use. This service by ISPs
7    allows for both temporary and long-term storage of electronic
8    communications and many other types of electronic data and files.
9    Typically, e-mail that has not been opened by an ISP customer is stored
10   temporarily by an ISP incident to the transmission of that e-mail to the
11   intended recipient, usually within an area known as the home directory.
12   Such temporary, incidental storage is defined by statute as "electronic
13   storage." See 18 U.S.C. § 2510 (15). A service provider that is available to
14   the public and provides storage facilities after an electronic
15   communication has been transmitted and opened by the recipient, or
16   provides other long-term storage services to the public for electronic data
17   and files, is defined by statute as providing a "remote computing service."
18   See 18 U.S.C. § 2711(2).

19   i. Internet Protocol Address (IP address): Every computer or device on the
20   Internet is referenced by a unique Internet Protocol address the same way
21   every telephone has a unique telephone number. An IP address is a series
22   of four numbers separated by a period, and each number is a whole
23   number between 0 and 254. An example of an IP address is
24   192.168.10.102. Each time an individual accesses the Internet, the
25   computer from which that individual initiates access is assigned an IP
26   address. A central authority provides each ISP a limited block of IP
27   addresses for use by that ISP's customers or subscribers. Most ISP's
28   employ dynamic IP addressing, that is they allocate any unused IP

addresses at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time, and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Typically, users who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial up session. Once the session ends, the IP address is available for the next dial up customer. On the other hand, some ISP's, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer.

j. Log file: Log files are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a Web site was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

k. Malicious Software ("malware"): Software designed to infiltrate a computer without the owner's informed consent. The expression is a general term used by computer professionals to mean a variety of forms of hostile, intrusive, or annoying software or program code. Software is

considered malware based on the perceived intent of the creator rather than any particular features. Malware includes computer viruses, worms, trojan horses, most rootkits, spyware, dishonest adware, crimeware, and other malicious and unwanted software.

l. Metadata: Data contained in a file that is not usually associated with the content of a file but is often associated with the properties of the application or device that created that file. For example, a digital camera photograph often has hidden data that contains information identifying the camera that manufactured it and the date the image was taken.

m. Steganography: Art and science of communicating in a way that hides the existence of the communication. It is used to hide a file inside another. For example, a child pornography image can·be hidden inside another graphic image file, audio file, or other file format.

n. Trace Route: A trace route is an Internet debugging tool used to document the list of inter-connected computers between two computers on the Internet. A trace route will list the names and IP addresses of computers that provide the physical link between two computers on the Internet. Trace routes are useful tools to help geographically identify where a computer on the Internet is physically located, and usually includes information about the registered owner of computers on the Internet.

o. Uniform Resource Locator (URL): The address of a resource or file located on the Internet, also called a "domain name".

p. Web site Hosting: Web site hosting provides the equipment and services required to host and maintain files for one or more web sites and to provide rapid Internet connections to those web sites. Most hosting is "shared," which means that multiple web sites of unrelated companies are on the same server in order to reduce associated costs. When a client develops a Web site, the client needs a server and perhaps a web hosting

1    company to host it. "Dedicated hosting" means that the web hosting

2    company provides all of the equipment and assumes all of the

3    responsibility for technical support and maintenance of a Web site. "Co-

4    location" means a server is located at a dedicated hosting facility designed

5    with special resources, such as a secure cage, regulated power, a dedicated

6    Internet connection, online security and online technical support. Co-

7    location facilities offer customers a secure place to physically house their

8    hardware and equipment as opposed to keeping it in their offices or

9    warehouses, where the potential for fire, theft, or vandalism is greater.

10

11   ## Computers and Child Pornography

12   15. Based upon my knowledge, training, and experience in child exploitation and child

13   pornography investigations, and the experience and training of other law

14   enforcement officers with whom I have had discussions, computers and computer

15   technology have revolutionized the way in which child pornography is produced,

16   distributed and utilized. Prior to the advent of computers and the Internet, child

17   pornography was produced using cameras and film, resulting in either still

18   photographs or movies. The photographs required darkroom facilities and a

19   significant amount of skill in order to develop and reproduce the images. As a

20   result, there were definable costs involved with the production of pornographic

21   images. To distribute these images on any scale also required significant resources.

22   The photographs themselves were somewhat bulky and required secure storage to

23   prevent their exposure to the public. The distribution of these wares was

24   accomplished through a combination of personal contacts, mailings, and telephone

25   calls, and compensation for these wares would follow the same paths. More recently,

26   through the use of computers and the Internet, distributors of child pornography

27   use membership-based/subscription-based web sites to conduct business, allowing

28   them to remain relatively anonymous.

16. In addition, based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, the development of computers has also revolutionized the way in which child pornography collectors interact with, and sexually exploit, children. Computers serve four basic functions in connection with child pornography: production, communication and distribution, and storage. More specifically, the development of computers has changed the methods used by child pornography collectors in these ways:

  a. Production: Producers of child pornography can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images can be lightened, darkened, cropped, or otherwise manipulated. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

  b. Communication and Distribution: The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. In addition, the Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child

pornography; and (ii) web sites that offer images of child pornography. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet. Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache[2] to look for "footprints" of the web sites and images accessed by the recipient.

c. Storage: The computer's capability to store images in digital form makes it an ideal repository for child pornography. A single floppy disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 80 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country. Once this is done, there is no readily apparent evidence

---

[2] "Cache" refers to text, image and graphic files sent to and temporarily stored by a user's computer from a web site accessed by the user in order to allow the user speedier access to and interaction with that web site.

1    at the "scene of the crime." Only with careful laboratory examination of

2    electronic storage devices is it possible to recreate the evidence trail.

3

4  **Overview of Peer-to-Peer Child Pornography Investigation; Terms,**

5  **Background and Methodology:**

6  17. In October 2005 Detective Williams and Internet Crimes Against Children Task

7    Force Agents began working an Internet undercover operation to identify persons

8    using peer-to-peer (P2P) software on the Internet to traffic in child pornography.

9    Your Affiant knows from training and experience that peer-to-peer networks, are

10    frequently used to trade child pornography.

11  18. While examining P2P file sharing networks your Affiant learned that computer

12    users can chose to install publicly available software that facilitates the trading of

13    images. The software, when installed, allows the user to search for pictures, movies

14    and other digital files by entering text as search terms. That text search is sent to

15    an ultra-peer. An ultra-peer is an index server that handles requests and examines

16    submitted file lists from peers that it knows about for files matching the text search

17    request. A file list is then sent back to the requesting user who can choose to

18    download files from peers who possess at least a portion of the file.

19  19. Search results presented to the user allow the user to select a file and then receive

20    that file from other users around the world. These users can receive the selected file

21    from numerous sources at once. The software can balance the network load and

22    recover from network failures by accepting pieces of the file from different users and

23    then reassembling the file on the local computer.

24  20. Peer to peer networks can only succeed in reassembling the file from different parts

25    if the parts all come from the same original file. Your Affiant knows that multiple

26    persons sharing one file can deliver different pieces of that file to the local software

27    and the local software can insure that a complete and exact copy can be made from

28

1    the parts. Your Affiant has been able to confirm from use of the software that
2    different copies of the same file can be named differently.

3    21. Even though the peer to peer networks links together computers all over the world
4    and users can download files, it is not possible for one user to send or upload a file
5    to another user of the P2P network. The software is designed only to allow files to
6    be downloaded that have been selected. One does not have the ability to send files
7    from his/her computer to another user's computer without their permission or
8    knowledge. Therefore, it is not possible for one user to send or upload child
9    pornography files to another user's computer without his/her active participation.
10   22. Peer to peer computer software has different methods to insure that two files are
11   exactly the same. Your Affiant knows from training and experience that the method
12   used by the P2P operation described herein involves a compressed digital
13   representation method called Secure Hash Algorithm Version 1 or SHA1. Your
14   Affiant knows that the Secure Hash Algorithm (SHA) was developed by the
15   National Institute of Standards and Technology (NIST), along with the National
16   Security Agency (NSA), for use with the Digital Signature Standard (DSS) as
17   specified within the Secure Hash Standard (SHS). The United States of America
18   has adopted the SHA1 hash algorithm described herein as a Federal Information
19   Processing Standard.

20   23. Digital files can be processed by this SHA1 standard resulting in a digital
21   signature. By comparing these signatures your Affiant can conclude that two files
22   are or are not identical with a precision that greatly exceeds 99.9999 percent
23   certainty. Your Affiant knows through the computer forensic community that there
24   has never been a documented occurrence of two different files being found on the
25   Internet having different contents while sharing the same SHA1 value.

26   24. The use of SHA1 compressed digital representations for the matching of movies and
27   images has proven to be extremely reliable. Through this method of comparison

28

1   your Affiant has matched thousands of files and has never found two files with
2   different contents but the same SHA1 value.

3  25. The P2P network investigated in this operation uses the SHA1 digital signature to
4   verify the unique identity of individual files. Your Affiant knows that users
5   attempting to trade files on a P2P file-sharing network can place files from their
6   local computer into a shared file directory. If that user then starts the P2P software,
7   that local computer calculates the SHA1 signature for each shared file and provides
8   that information to other users wishing to trade files.

9  26. Entering search terms in the P2P software results in a list of SHA1 digital
10   signatures that your Affiant can choose for download. By using this type of search
11   your Affiant compares the offered SHA1 signatures with SHA1 signatures known to
12   belong to movies or images of child pornography. Your Affiant confirms these SHA1
13   values as belonging to child pornography by examining the files from previous
14   investigations with the matching SHA1 value. By watching these movies or viewing
15   these images your Affiant is able to determine the exact file referenced by the given
16   SHA1 value. Once a matching set of digital signatures is identified, your Affiant
17   submits a download request for the file.

18  27. This method has proven to be extremely reliable, working just like software used by
19   end users around the world in locating and downloading precise files. Once the
20   download of child pornography is initiated, Detective Williams received a list of
21   download candidates who are participating in the possession, receipt and/or
22   distribution of child pornography. This feature allows your Detective Williams to
23   conduct undercover operations that involve images of child sexual abuse being
24   traded on peer-to-peer networks.

25  28. Internet computers identify each other by an Internet Protocol or IP address. Your
26   Affiant knows that these IP addresses can assist law enforcement in finding a
27   particular computer on the Internet. These IP addresses lead the law enforcement
28   officer to a particular Internet Service Provider (ISP) or company. Given the date

1    and time the IP address was used, an ISP can typically identify the account holder
2    by name and physical address.

3    29. Your Affiant learned that searching on a peer-to-peer network as described above
4    results in your Affiant receiving a list of IP addresses identifying locations where a
5    computer has P2P software installed and individual files have been reported as
6    available for download with a specific digital signature (SHA1). These computers
7    are referred to as download candidates. A download candidate is a computer that
8    was reported by an ultra-peer as a source for the file listed by SHA1 value. In
9    almost every known case, the download candidate serves those files to P2P users
10   across the Internet. Computers from throughout the world can download files from
11   download candidates without regard to geographic location. Files located on P2P
12   download candidates are quickly available throughout the world due to the
13   distributed sharing model of P2P networks.

14   30. Peer to peer software may display the Globally Unique Identifier (GUID)
15   identification number of computers offering to share files on the network. A
16   Globally Unique Identifier or GUID is a pseudo-random number used in software
17   applications. This GUID number is produced when some P2P software applications
18   are installed on a computer. While each generated GUID is not guaranteed to be
19   unique, the total number of unique keys is so large that the probability of the same
20   number being generated twice is very small. When comparing these GUIDs, your
21   Affiant can quickly determine with a high degree of certainty that two different IP
22   addresses that are associated with the same GUID are associated with the same
23   computer. Should the computer be used to access the internet from a different IP
24   address the GUID will remain the same as it is intrinsic to the computer system.
25   Further, should the user of the computer update the file sharing program with a
26   newer version, a new GUID will be assigned to the computer for the updated
27   program.

28

31. Cooperating police agencies pool their information to assist in identifying criminal conduct and build probable cause to further criminal investigations. With this pooled information police get a better understanding of the global information available about a suspect who resides in their area of jurisdiction. This information is valuable when trying to regionalize a suspect to a certain jurisdiction, given the global scope of the Internet. Investigators from around the world gather and log information, which can be used by an investigator to build probable cause on one specific case.

32. By examining a list of IP addresses your Affiant can locate computers that are reported to be in California. By comparison of the SHA1 digital signatures your Affiant can conclude that a computer, originating from an IP address known to be in California, has P2P software installed on it and contains images of child pornography. With this information a request can be made to the Internet service provider to identify the specific physical address related to the use of P2P software in the exchange of child pornography.

33. Your Affiant is aware that over 300 search warrants have been executed in the State of California by using the above method of investigation. This method has proven to be extremely reliable in determining the location of computers that were involved in the P2P-facilitated trading of child pornography. Your Affiant has been involved in some of those search warrants either as the primary investigator, or assisting other investigators with their warrants. By using the above listed method of investigation, nearly every case was verified through the following means:

    a. Evidence of child pornography was found on the computer;

    b. If no images of child pornography were found on the computer, interviews of persons using those computers verified that child pornography had been present at one time but had been deleted or the computer with the child pornography had been removed from the premises; or

1          c.   Evidence was found showing that images of child pornography were

2             moved from the computer and stored on other media.

3   34. Your Affiant knows that Detective William Wiltse with the Salem Oregon Police

4      Department has created an automated system called Peer Spectre, that reads in a

5      consistent and reliable manner the publicly available advertisements from

6      computers that are identifying child sexual abuse images available for distribution.

7      The software reads these reported offers to participate in the sharing of child

8      pornography and reports the time, date, SHA1 values and filename for each

9      individual computer in the same way every time. Your Affiant has validated this

10     software by running identical search terms through the manual method described

11     above and the automated system using Peer Spectre, and has confirmed that Peer

12     Spectre performs in the same way with matching results as the previous manual

13     investigative techniques used in this operation to date.

14   35. An investigator can review these details and identify a pattern of activity that links

15     a single IP address to specific files of child pornography with an extremely high

16     degree of accuracy. Peer Spectre automates the search process but conducts and

17     reports the search in the same manner that was previously done by individual

18     investigators. Peer Spectre does not report details that are not also discoverable by

19     the general public using Internet available software.

20   36. Detective Williams conducted his investigation using the Child Protection System

21     ("CPS") suite of tools. CPS utilizes the same information obtained from Peer

22     Spectre through the same servers, which are now located in Boca Raton, Florida

23     and owned by the Office of the State Attorney, 15th Judicial Circuit, having been

24     previously owned and maintained by the Wyoming Internet Crimes Against

25     Children Task force under the Wyoming Attorney General's Office. CPS is a law

26     enforcement maintained database utilized by federal and state law enforcement

27     agencies in child exploitation investigations nationwide. CPS maintains a log of IP

28     addresses that have been previously involved in the possession and distribution of

1     child pornography. Detective Williams has used this database and its predecessor

2     for more than six years investigating hundreds of cases and making over 100

3     arrests and has verified that information concerning Detective Williams actions

4     while using the database had been logged into the database in a timely and

5     accurate manner.  Files are automatically compared to a known set of hash values

6     as contained in the database that evidence child pornography from previous

7     investigations by other law enforcement officers.

8    37. Detective Williams uses an undercover investigative software, called E-Phex, which

9     is currently used in state and local Peer-to-Peer (P2P) file sharing investigations to

10    download the files of child pornography. Downloading is a transfer of data from one

11    computer to another. Since Detective Williams was doing the download, he was

12    receiving data which was transmitted from another computer. This software is

13    designed by and for law enforcement and only available to law enforcement officers

14    who have attended the appropriate training. Detective Williams has done so. E-

15    Phex is designed to connect directly to one IP address and browse or download from

16    one specific peer at a time. E-Phex is a P2P file sharing client similar to other file

17    sharing clients (like Limewire or Bearshare) on the Gnutella network which are free

18    and available to the public.

19   38. Using source code from a free P2P client, E-Phex was modified by/for law

20    enforcement to meet the stringent investigative requirements of these cases. For

21    example, E-Phex will only download files from a single source – the target IP, while

22    the public version will download from many sources. E-Phex thus takes much

23    longer to download files because of the single source limitation. E-Phex uses only

24    publicly available P2P options which follow the programming language (protocols)

25    set forth in the public P2P protocol standards. No functionality outside of the

26    publicly available protocols is added, thus eliminating any potential private

27    intrusion on the suspect IP's computer or files. E-Phex uses the same code and

28    language that is available to any and all software developers.

39. A listing of IP address. which have been observed on P2P networks offering files that have a SHA1 Hash Value of suspected files of child pornography (hereinafter "suspect IP"), are included in E-Phex. These IP addresses are obtained by the investigator from law enforcement secured databases. One of the sources of these IP addresses is from IP addresses that are observed by automated systems, such as Peer Spectre. An automated function of E-Phex will attempt to connect to a suspect IP address when it is observed being "on-line" and send a request to browse (i.e. look at and log the information being transmitted and/or shown by the suspect IP) and/or download a file from the shared folder of the computer utilizing the suspect IP address. If the connection is not made to either browse or download, E-Phex will continue automatically to attempt to make a connection with the suspect IP address.

40. If a connection is made with the suspect IP address, E-Phex will log the connection. It will also take a photo snapshot of the browse in real time so as document exactly what was being displaying by the computer of the suspect IP address. E-Phex then attempts to download files from the suspect IP address directly into the investigator's computer and, if successful, segregates it from other evidence.

41. Prior to beginning an investigation using E-Phex, Detective Williams, by installing E-Phex on a law enforcement secured and ICAC-only computer, created a folder structure on the hard drive of his own computer in which E-Phex stores files and logs that are downloaded and created, respectively. Both the downloaded files and logs are reported in the appropriate folders created for the target peer IP.

42. E-Phex separates completed downloaded files from incomplete downloaded files. E-Phex logs the Netstats. Netstats (or network statistics) is a command-line tool that displays network connections (both incoming and outgoing), routing tables, and a number of network interface statistics. This enables your Affiant to ascertain exactly which IP address the download came from and at precisely what time. E-Phex captures the file names and SHA-1 values of the images appearing on the P2P

1   client associated with the suspect IP address that match known SHA-1 values of
2   child pornography. E-Phex also captures the P2P version being used by the suspect
3   IP address.

4   43. Upon E-Phex downloading the file, another screen shot of the download is logged
5   that captures file information, including the file name, hash value, status of the
6   download, time of the download, and size of the file. The logs themselves identify
7   that a known SHA1 value of child pornography has been located, and when the
8   download transfer started and ended. The length of time the download process
9   takes depends on the size of the file and speed of the internet/computer of both your
10   Affiant and the suspect IP's computer. When a file has successfully completed the
11   download process, E-Phex notifies Detective Williams.

12   44. Detective Williams validated E-Phex by conducting investigations manually using
13   publicly available Gnutella clients and compared the results with the automated E-
14   Phex process and found the results to be identical.

15

16   **Probable Cause to Search the SUBJECT PREMISES:**

17   45. I am familiar with Peer to Peer (P2P) file sharing, specifically the operation of the
18   Gnutella networks. The Gnutella networks are P2P networks used to exchange files
19   between computers. The Gnutella networks, like other P2P file sharing networks,
20   use file hashing to uniquely identify files on the network and users typically locate
21   files with keyword searches.

22   46. On Thursday, April 24, 2014 at 1053, Detective Williams attempted to obtain a list
23   of files reported as being shared on the Gnutella by the computer at IP address
24   24.10.72.113. The computer at IP address 24.10.72.113 reported 3 files being shared
25   on the Gnutella netowrk, of which 2 files were investigative files of interest. Below
26   are the 2 filenames and their SHA-1 values:

27   ///

28   ///

| File Name | SHA-1 |
|-----------|-------|
| (Pthc) Tara (8Yo) Tara Likes (2007).mpg | 6PA2SSLGLFWBC7M3FYKAQUJBN5HYJ2TZ |
| Pedofilia PTHC Child cum - Little Linda 10yo fucks the pedo man.avi | F47XVSNMLMUPQTQX72RLYCXRMNJIPJCO |

On Thursday, April 24, 2014 while directly connected to the computer at IP address 24.10.72.113, Detective Williams captured the GUID associated to the peer to peer program operating on that computer. The program reported itself to be Frosty/4.21.1.; the GUID was reported to be 17513F133429F03BA290A62A712F5200.

47. On Thursday, April 24, 2014, between 1054 hrs and 1058 hrs, Detective Williams downloaded and I viewed the following file that the computer at IP address 24.10.72.113 was making available:

| File Name | SHA-1 |
|-----------|-------|
| (Pthc) Tara (8Yo) Tara Likes (2007).mpg | 6PA2SSLGLFWBC7M3FYKAQUJBN5HYJ2TZ |

Description: This was a color video, approximately two minutes and 26 seconds in length. The video starts with a naked girl approximately eight to ten years old laying on her back on a bed and inserting her fingers into her vagina. The girl then rubs her vagina on the bedpost of the bed.

48. On Thursday, April 24, 2014 Detective Williams conducted a query on the IP address 24.10.72.113 through the American Registry for Internet Numbers (ARIN). ARIN reported IP address 24.10.72.113 to be registered to Comcast Cable Communications, Inc.

49. On Sunday, April 27, 2014 at 0626, Detective Williams again obtained a list of files reported as being shared on the network from the computer at IP address 24.10.72.113. The file list showed changes in the number and/or content of the investigative files of interest. The file list contained 3 files of which 2 files were investigative files of interest. Below are the 2 filenames and SHA-1 values.

| File Name | SHA-1 |
|---|---|
| Pthc pedo - Mom sucks son 10 year in the shower (1).mpg | N4CQJ7F2VF63DIUN4ODTZTMSXDDMU5JW |
| PEDO qqaazz #04b pthc maryanne NEW NOVEMBER 2007 CUM ON MY DAUGHTER pedo incest 6yo girl italy (14).avi | ZDZRKTE3MQDTQHNEMVLIXVGUNPIC3UFL |

50. On Sunday, April 27, 2014, between 0627 hrs and 0631 hrs, Detective Williams downloaded the following 1 file(s) that the computer at IP address 24.10.72.113 was making available and I viewed the below file:

| File Name | SHA-1 |
|---|---|
| Pthc pedo - Mom sucks son 10 year in the shower (1).mpg | N4CQJ7F2VF63DIUN4ODTZTMSXDDMU5JW |

Description: This is a color video, approximately eight seconds in length. The video starts with a a fully naked boy approximately 10-12 years old that was standing and what appeared to be a female orally copulating the males penis.

51. On Sunday, April 27, 2014 at 0702, Detective Williams again obtained a list of files reported as being shared on the network from the computer at IP address 24.10.72.113. The file list showed changes in the number and/or content of the investigative files of interest. The file list contained 15 files of which 7 files were investigative files of interest. Below are the 7 filenames and SHA-1 values:

| File Name | SHA-1 |
|---|---|
| Pthc pedo - Mom sucks son 10 year in the shower (1).mpg | N4CQJ7F2VF63DIUN4ODTZTMSXDDMU5JW |
| PEDO qqaazz #04b pthc maryanne NEW NOVEMBER 2007 CUM ON MY DAUGHTER pedo incest 6yo girl italy (14).avi | ZDZRKTE3MQDTQHNEMVLIXVGUNPIC3UFL |
| Pedo - Dad & Daughter 12Yo Hairless Preteen Oral Anal Masturbation (Gq) (Pthc) - ▮▮▮▮▮▮ (Vicky) - Pedofilia Part5.mpg | RSBEHNISF6HTPTZQCCYSUOTGH42F5J5D |

| File Name | SHA-1 |
|---|---|
| NEW!! PTHC Sex Lessons - Jerking & Facial -- Show this training video to your daughter to get her ready!! -- hussyfan kingpas pthc pedo kingpass babyj babyshi vicky incest hu.mpg | Y3DD44B4BPB3FOZO3TLQ5X5MHQJXTUQX |
| (Pthc) Man Cums On Little 5yo Thai Girl.avi | MIIPJ7ALKAHXZ24NOC4CWE4DM4MGB3XO |
| 2010 Pthc Pedo Frifam 6Yo Alexa Licks 2Yo Baby Rosie Live On Cam.avi | UMABOCQ2V64W5NZDAGKNOKOHMYO3O5PK |
| (Pthc 2012 !!!) Real Pedo Movies 014.avi | YKYJXI2QGYVATSOJPU6VIAFRAZMFFBDD |

52. On Sunday, April 27, 2014, between 0702 hrs and 0713 hrs, Detective Williams downloaded the following file that the computer at IP address 24.10.72.113 was making available. I viewed this file and saw that it showed the following:

| File Name | SHA-1 |
|---|---|
| (Pthc) Man Cums On Little 5yo Thai Girl.avi | MIIPJ7ALKAHXZ24NOC4CWE4DM4MGB3XO |

Description: This was a color video, approximately 17 seconds in length. The video starts with a girl approximately five to seven years old with her mouth on an erect penis of an adult male laying on his back and the camera is pointed towards his feet. The male is masturbating and ejaculates into the mouth of the girl.

53. On Sunday, April 27, 2014 at 0903, Detective Williams again obtained a list of files reported as being shared on the network from the computer at IP address 24.10.72.113. The file list showed changes in the number and/or content of the investigative files of interest. The file list contained 20 files of which 8 files were investigative files of interest. Below are the 8 filenames and SHA-1 values:

| File Name | SHA-1 |
|---|---|
| Pthc pedo - Mom sucks son 10 year in the shower (1).mpg | N4CQJ7F2VF63DIUN4ODTZTMSXDDMU5JW |

| File Name | SHA-1 |
|---|---|
| PEDO qqaazz #04b pthc maryanne NEW NOVEMBER 2007 CUM ON MY DAUGHTER pedo incest 6yo girl italy (14).avi | ZDZRKTE3MQDTQHNEMVLIXVGUNPIC3UFL |
| Pedo - Dad & Daughter 12Yo Hairless Preteen Oral Anal Masturbation (Gq) (Pthc) - [redacted] (Vicky) - Pedofilia Part5.mpg | RSBEHNISF6HTPTZQCCYSUOTGH42F5J5D |
| NEW!! PTHC Sex Lessons - Jerking & Facial -- Show this training video to your daughter to get her ready!! -- hussyfan kingpas pthc pedo kingpass babyj babyshi vicky incest hu.mpg | Y3DD44B4BPB3FOZO3TLQ5X5MHQJXTUQX |
| (Pthc) Man Cums On Little 5yo Thai Girl.avi | MIIPJ7ALKAHXZ24NOC4CWE4DM4MGB3XO |
| 2010 Pthc Pedo Frifam 6Yo Alexa Licks 2Yo Baby Rosie Live On Cam.avi | UMABOCQ2V64W5NZDAGKNOKOHMYO3O5PK |
| (Pthc 2012 !!!) Real Pedo Movies 014.avi | YKYJXI2QGYVATSOJPU6VIAFRAZMFFBDD |
| ã€ ç„¡ä¿®æ£ã€'ã€ æ´‹ç‰©ã€'(((KINGPASS))) (pthc) (dark studio) ãƒãƒªï¼–ä°å…¨å“¡ã Šã —ã £ã "ã€€ãƒãƒªã Œãƒ- ãƒªã‚'èª¿æ•™d('Ìµï¼Ÿæœ€é«˜).mpg | 7J3JEA3N7GPURLZ7BGD2Q6E5NZEGDJ3B |

54. On Sunday, April 27, 2014, between 1135 hrs and 1146 hrs, Detective Williams downloaded the following file that the computer at IP address 24.10.72.113 was making available. I viewed this file and it is described as follows:

| File Name | SHA-1 |
|---|---|
| PEDO qqaazz #04b pthc maryanne NEW NOVEMBER 2007 CUM ON MY DAUGHTER pedo incest 6yo girl italy (14).avi | ZDZRKTE3MQDTQHNEMVLIXVGUNPIC3UFL |
| Description: This was a color video, approximately 26 seconds in length that shows a girl approximately 6-7 years old that was laying on her back and she had her mouth on an erect adult male penis. | |

55. The computer at IP address 24.10.72.113 was the sole candidate for these downloads, and as such, the entire file was downloaded directly from this IP address.

56. On April 28, 2014, Detective Williams sent an administrative subpoena to Comcast Cable requesting the subscriber information for the IP address 24.10.72.113 from April 24, 2014 at 1053 Hours PDT (UTC -0700) to April 27, 2014 at 1234 Hours PDT (UTC -0700). These were the times and dates that this IP address was observed offering files of suspected child pornography.

57. April 29, 2014, I received the requested information from Comcast Cable and saw that the subscriber information was:

> Lacy Castro-Barr
> 4901 Little Oak Lane, Apartment #185
> Sacramento, CA 95841
> 650-679-3821
> High Speed Internet Service
> Active Account

58. June 5, 2014, I sent a customer information request to SMUD and the customer for the residence at 4901 Little Oak Lane, Apartment #185, Sacramento, CA 95841. I received the results and it stated that the subscriber was Lacy L Castro, with a phone number of 650-xxx-3821.

59. I checked the Sacramento Sheriff's Department Known Persons System for Lacy Castro-Barr and it resulted in no matches.

60. A check of California Department of Motor Vehicles for Lacy Castro-Barr resulted in no matches.

61. A check of California Law Enforcement Telecommunications System (CLETS) for Lacy Castro-Barr resulted in no matches.

62. A check of public databases for Lacy Castro-Barr and there was a female listed with an address of 4901 Little Oak Lane Apartment #185, Sacramento, CA 95841 with a date of birth of November 13, 1991.

63. I obtained a description of the residence. While I was obtaining the description, I checked the area around the residence for wireless signals and saw that all of the detectable wireless routers were secured with the exception of one router with the name "xfinitywifi". Approximately one year ago Xfinity which is owned by Comcast started a project to blanket residential and commercial areas with continuous Wi-Fi coverage. Xfinity/Comcast would take the home's private Wi-Fi router and turn it into a public hotspot where Xfinity/Comcast customers could log in with their account information to receive Wi-Fi coverage.

64. Based upon your Affiant's previous investigative experience related to child pornography investigations, including investigations of subjects who have distributed child pornography via the Internet that I have been the investigating officer of, your Affiant is aware that individuals who share and distribute child pornography are often child pornography collectors who have escalated their activity from anonymously obtaining free images of child pornography widely available in various locations on the Internet to proactively distributing images they have collected, often for the purposes of trading images of child pornography with others as a method of adding to their own  collections. Individuals involved in the distribution of child pornography are also known to continue to obtain free images of child pornography found elsewhere on the Internet, e.g. in Newsgroups and on "free" web sites.

65. Based upon my own knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

    a. Child pornography collectors may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually

AFFIDAVIT FOR SEARCH WARRANT        28

suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b. Collectors of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Collectors of child pornography almost always possess and maintain their "hard copies" of child pornography material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d. Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

e. Child pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often

1          maintain lists of names, addresses, and telephone numbers of individuals

2          with whom they have been in contact and who share the same interests in

3          child pornography.

4       f.   Collectors of child pornography prefer not to be without their child

5          pornography for any prolonged time period. This behavior has been

6          documented by law enforcement officers involved in the investigation of

7          child pornography throughout the world.

8   66. The undersigned Affiant submits that there is probable cause to believe that an

9      individual found to be utilizing the computer located at the SUBJECT PREMISES

10     is a collector of child pornography. This opinion is based upon the fact that a suspect

11     computer located at the SUBJECT PREMISES has been identified pursuant to this

12     investigation as an instrumentality in the distribution of child pornography, and

13     your Affiant's knowledge and investigative experience related to the habits and

14     tendencies of child pornography distributors. Your Affiant also bases this opinion on

15     his investigative experience gained during the execution of previous search

16     warrants related to individuals identified as distributors of child pornography in

17     unrelated investigations, namely, that individuals identified as distributors of child

18     pornography have been found to be in possession of massive quantities of child

19     pornography.

20   67. Finally, based upon the conduct of individuals involved in the collection of child

21     pornography set forth above, namely that they tend to maintain their collections at

22     a secure, private location for long periods of time, there is a probable cause to

23     believe that evidence of the offenses of attempted transportation, receiving, and

24     possessing child pornography is currently located at the SUBJECT PREMISES.

25   68. Your Affiant knows from training and experience that peace officer(s) or assigned

26     representative(s) should videotape, photograph and/or digital image the location

27     during the execution of this search warrant. The Affiant needs control of who takes

28     the images. Computer(s) at the scene may be operating during the service of the

search warrant. The images on the computer(s) screens are transient, it may be necessary to videotape, photograph and/or digital image the computer monitor screen(s). Photographing of the location, vehicles and persons present at the scene is often helpful in the showing possession of the premises and evidence. It is also good to show the condition of the location as the search warrant is served and to show the condition of the location after the search warrant has been served.

## Specifics Regarding the Seizure and Searching of Computer Systems

69. Your Affiant knows from training and experience that digital evidence is not limited to computers. Your Affiant has been involved in numerous cases where persons with an interest in child exploitation materials can access the Internet, display images of child pornography and communicate with other individuals with the same interest using digital communications devices to include cellular telephones, email devices and personal digital assistants. These devices are frequently found to contain chat communications in the form of short message service (SMS) messages as well as enabling Internet and digital cellular network access. Your Affiant knows that there are P2P client applications for use on cell phones including at least one for the P2P network described herein.

70. Searches and seizures of evidence from computers and other Internet access devices require agents to seize most or all electronic items (hardware, software, passwords and instructions) to be processed later by appropriate personnel in a controlled environment. Digital storage media may include but is not limited to floppy disks, hard drives, tapes, DVD disks, CD-Rom disks or other magnetic, optical or mechanical storage which can be accessed by computers or other electronic devises to store or retrieve data of images of child pornography, which can store the equivalent of thousands of pages of information. Users may store information or images in random order with deceptive file names, which requires searching authorities to examine all the stored data to determine whether it is included in the

1    search warrant. This sorting process renders it impractical to attempt this kind of
2    data search on site.

3   71. Searching digital evidence systems for criminal evidence requires experience in the
4    computer and cellular telephone field and a properly controlled environment in
5    order to protect the integrity of the evidence and recover even "hidden," erased,
6    compressed, password-protected, or encrypted files. Since digital evidence is
7    extremely vulnerable to tampering or destruction (both from external sources or
8    from destructive code imbedded in the system as a "booby trap"), a controlled
9    environment is essential to its complete and accurate analysis.

10  72. Computers and other digital communications devices contain volatile memory that
11    contains information only while the device is in a powered on and/or running state.
12    Your Affiant knows that powering off the device may result in the loss of the
13    volatile information. Adding an external evidence storage device will cause minor
14    changes to the state of the computer but will allow for the best effort in fully
15    capturing the state of the running evidence. This capture of information requires
16    technical expertise to ensure the resulting data can be examined by all subsequent
17    investigators. This captured information may include current and recent use of the
18    computer, use of encryption, use of other communications devices, routes of Internet
19    and other digital communications traffic and passwords, encryption keys or other
20    dynamic details relevant to use of the system.

21  73. In order to fully retrieve data from a computer or other digital communications
22    system, the analyst needs all magnetic storage media as well as the storage devices.
23    In addition, the analyst needs all the system software (operating systems or
24    interfaces, and hardware access software or drivers) and any applications software
25    which may have been used to create the data (whether stored on hard drives or on
26    external media) as well as all instruction manuals or other documentation and data
27    security devices, and all items containing or displaying passwords, access codes,
28    usernames or other identifiers necessary to examine or operate items, software or

1   information seized or to activate specific equipment or software. In cases like the
2   instant one where the evidence consists partly of image and video files, the monitor
3   and printer are essential to show the nature and quality of the graphic images,
4   which the system could produce. Finally, where there is probable cause to believe
5   that the computer and its storage devises, the monitor, keyboard, and modem,
6   hardware and software are all instrumentalities of the crime of possession, receipt,
7   or transportation of sexually explicit depictions of minors in violation of federal law,
8   they should also all be seized as such.

9   74. As further described in Attachment B, this warrant seeks permission to locate in
10  the SUBJECT PREMISES not only computer files that might serve as direct
11  evidence of the crimes described in the warrant, but also for evidence that
12  establishes how computers were used, the purpose of their use, and who used them.
13  Further, as described above and in Attachment B, this application seeks permission
14  to search and seize records that might be found on the SUBJECT PREMISES, in
15  whatever form they are found. One form in which the records might be found is
16  that they are stored on a computer's hard drive, or other electronic media. Some of
17  these electronic records might take the form of files, documents, and other data that
18  is user-generated. Some of these electronic records, as explained below, might take
19  a form that becomes meaningful only upon forensic analysis of the computer(s) or
20  other electronic storage media seized.

21  75. Although some of the records called for by this warrant might be found in the form
22  of user-generated documents (such as word processor, picture, and movie files),
23  computer hard drives can contain other forms of electronic evidence as well. In
24  particular, records of how a computer has been used, the purposes for which it was
25  used, and who has used it are called for by this warrant. As described above, data
26  on the hard drive not currently associated with any file can provide evidence of a
27  file that was once on the hard drive but has since been deleted or edited, or of a
28  deleted portion of a file (such as a paragraph that has been deleted from a word

1   processing file). Virtual memory paging systems can leave traces of information on

2   the hard drive that show what tasks and processes on the computer were recently

3   used. Web browsers, e-mail programs, and chat programs store configuration

4   information on the hard drive that can reveal information such as online nicknames

5   and passwords. Operating systems can record additional information, such as the

6   attachment of peripherals (e.g., cameras and printers for creating or reproducing

7   images), the attachment of USB flash storage devices, and the times and dates the

8   computer was in use. Computer file systems can record information about the dates

9   files were created and the sequence in which they were created. This information

10  can sometimes be evidence of a crime, or can point toward the existence of evidence

11  in other locations. Evidence of this type is a conclusion, based on a review of all

12  available facts and the application of knowledge about how a computer behaves.

13  Therefore, contextual information necessary to understand the evidence described

14  in Attachment B is included within the scope of the warrant.

15  76. In finding evidence of how a computer has been used, the purposes for which it was

16  used, and who has used it, sometimes it is necessary to establish that a particular

17  thing is not present on a drive. For example, I know from training and experience

18  that it is possible that malicious software can be installed on a computer, often

19  without the computer user's knowledge. This software can allow a computer to be

20  used by others. To investigate the crimes described in this warrant, it might be

21  necessary to investigate whether any such malicious software is present on the

22  computer, and, if so, whether the presence of that malicious software might explain

23  the presence of other things found on the computer's hard drive.

24  77. Law enforcement personnel trained in searching and seizing computer data will

25  seize the computers, computer hardware, storage media, associated system

26  peripherals, and digital devices that are believed to contain or constitute fruits,

27  evidence and instrumentalities as described in Attachment B to the warrant, and

28  transport the same to an appropriate law enforcement laboratory for off-site review,

1    if, upon arriving at the scene, the agents executing the search conclude that it
2    would be impractical to search these items on-site for the evidence, fruits and
3    instrumentalities.  The computer equipment and storage devices will be reviewed by
4    a review team in accordance with and as defined by the review protocols described
5    below in order to extract and seize any data that falls within the list of items to be
6    seized as set forth in Attachment B.

7    78. In order to fully retrieve data from a computer system, the review team needs all
8    electronic storage devices as well as the computer's central processing unit (CPU).
9    The review team may also need the computer's storage devices, the monitor,
10   keyboard, modem, and other related hardware.  As in this case where the evidence
11   consists partly of graphic files, the monitor and printer are essential to show the
12   nature and quality of the graphic images that the system could produce.  In
13   addition, the review team needs all the system software (operating systems or
14   interfaces and hard drive drivers) and any application software that may have been
15   used to create the data (whether stored on hard drives or on external media).

16   79. Affiant knows from training and experience that persons trading in, receiving,
17   distributing or possessing images involving the exploitation of children or those
18   interested in the actual exploitation of children often communicate with others
19   through correspondence or other documents (whether digital or written) which
20   could tend to identify the origin of the images as well as provide evidence of a
21   person's interest in child pornography or child exploitation.

22   80. Affiant knows from training and experience that files related to the exploitation of
23   children found on computers and other digital communications devices are usually
24   obtained from the Internet or from cellular data networks using application
25   software which often leaves files, logs or file remnants which would tend to show
26   the method of location or creation of the images, search terms used, and the
27   exchange, transfer, distribution, possession or origin of the files.

28

81. Affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

82. Your Affiant is familiar with and understands the implications of the Privacy Protection Act (PPA), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities. Your Affiant is not aware that any of the materials to be searched and seized from the SUBJECT PREMISES are protected materials pursuant to the PPA. If any such protected materials are inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

83. Based on your affiant's knowledge, training, and experience, your Affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are

1   only overwritten as they are replaced with more recently viewed Internet pages.
2   Thus, the ability to retrieve residue of an electronic file from a hard drive depends
3   less on when the file was downloaded or viewed than on a particular user's
4   operating system, storage capacity, and computer habits. The search for these files
5   and file fragments can take considerable time, depending on the computer user's
6   practices. Against this backdrop and based on my training and experience, I hereby
7   request 120 days from the date of seizure to complete the search under controlled
8   conditions subject to extension by separate application.
9   84. Affiant knows from training and experience that computers or other digital devices
10   used to access the Internet usually contain files, logs or file remnants which would
11   tend to show ownership and use of the device as well as ownership and use of
12   Internet service accounts used for the Internet or cellular data network access.
13   85. Affiant knows from training and experience that digital crime scenes usually
14   include items or digital information that would tend to establish ownership or use of
15   digital devices and Internet access equipment and ownership or use of any Internet
16   service or digital cellular service accounts used to participate in the exchange,
17   receipt, possession, collection or distribution of child pornography.
18   86. Affiant knows from training and experience that persons with an interest in the
19   exploitation of children can have trophies from victims, items for the grooming of
20   children as well as collections of clothing and toys related to the exploitation of
21   children.
22   87. Affiant knows from training and experience that search warrants of residences
23   involved in computer or digitally-related criminal activity usually produce items
24   that tend to establish ownership or use of digital devices and ownership or use of
25   any Internet service accounts accessed to obtain child pornography to include credit
26   card bills, telephone bills, correspondence and other identification documents.
27   ///
28   ///

1  **Specific Methods for Searching Digital Evidence**

2  88. I am seeking authority to search for, among other things, items containing digital

3  data, more particularly described in Attachment B. As many devices commonly

4  found in a residence may contain digital data, I will make every reasonable effort to

5  minimize seizures to only those devices for which there is reason to believe might be

6  found: 1) evidence or fruits of the aforementioned crimes; 2) contraband implicated

7  by this affidavit; and 3) property/ instrumentalities designed for use, intended for

8  use, or used in the commission of the aforementioned crimes. If personnel trained

9  in the forensic preview of digital evidence are available, and if doing so will not

10  extend the duration of the search to an unreasonable time, I intend for there to be

11  an on-scene preview of the digital evidence in order to minimize the amount of

12  material that needs to be removed from the premises. I know that certain tools are

13  available to trained personnel that make such previews possible under certain

14  circumstances. Such a preview generally consists of reviewing images and videos

15  contained on digital media, and searching for filenames that appear to contain

16  references to child pornography. These previews are done in a manner that

17  preserves the integrity of the data on the device. A forensic preview is not a

18  substitute for a forensic examination, but in certain instances (such as when it is

19  possible through interviews to determine which items belong to uninvolved third

20  parties), an on-site forensic preview can be a useful tool in minimizing the number

21  of digital devices that need to be removed from the premises for a full forensic

22  examination. If an item that may reasonably contain evidence of child pornography

23  cannot be eliminated from suspicion, I intend to remove it to a laboratory setting for

24  a more detailed forensic examination in accordance with the parameters described

25  below.

26  89. As previously mentioned, the search of a computer hard drive or other computer

27  storage medium is a time-consuming manual process often requiring months of

28  work. I know that the seizure of a computer hard drive, by necessity, provides the

seizing agency with potential access to data outside the scope of this warrant. A search protocol will be used to uncover evidence, instrumentalities and contraband set forth in Attachment B for which there is probable cause. As part of the search protocol, I intend to direct the review team to search any computer and computer storage medium for those items contained in Attachment B. As it concerns this particular case, I intend to direct the review team to search digital media with some or all of the following methods, not listed in any particular order; however, the listing of these methods is not a representation that these specific techniques will be employed in this case:

a. Keyword Searches: I know that computer forensic utilities provide the capability for a user to search for specific key words that may exist on a piece of digital media. I intend to use specific keywords known to be related to either the subject's illicit internet activities or child pornography. As it concerns child pornography, examples of such keywords include, but are not limited to "preteen," "hussyfan," and "r@ygold." Those keyword searches will indicate files and other areas of the hard drive that need to be further reviewed to determine if those areas contain relevant data. A list of keywords utilized will be maintained with the records of the forensic examination.

b. Data Carving: I know that, as previously mentioned, data residue may be left in the "free," "unallocated," or "slack" space of a computer hard drive, that is, the space not currently used by active files. I further know that, as previously mentioned, many operating systems utilize temporary storage often referred to as "swap space" on the hard drive to store contents from main system memory. Such unallocated and swap space may contain the residue of files that can be carved out, often in an automated or semi-automated fashion. I intend to use forensic tools to carve out files, in particular, image files such as JPEG and GIF files. The

1         mere act of carving out such files does not expose me to the contents of

2         such recovered files, but makes those files available for further relevancy

3         checks, such as keyword searches (explained above) and hash value

4         comparisons (explained below).

5     c.   Hash Value Comparisons: I know that computer forensic utilities provide

6         the capability to utilize a function known as a hash algorithm. A hash

7         algorithm uses a mathematical formula to analyze the data composing a

8         file, and to generate a unique "fingerprint" for that file. The act of

9         hashing a piece of data does not reveal to an investigator any information

10       about the contents of that data. However, I know that computer forensic

11       applications often contain databases of known hash values for files. Some

12       of those files are "ignorable," which enables other forensic processes to

13       ignore files (such as the Windows operating system) that are not

14       evidentiary in nature. Some of the files are "alert" files, such as the Child

15       Victim Identification Program (CVIP) hash set that contains hash values

16       for a small subset of the identified picture and video files for known

17       victims of child pornography. CVIP alert files notify an examiner that a

18       file appears to contain known depictions of child pornography. I seek

19       permission to utilize automated hash value comparisons to both exclude

20       irrelevant files, and to locate known child pornography files. Hash value

21       comparisons are useful, but not definitive, as even a single-bit change to a

22       file will alter the hash value for the file. The forensic review team does not

23       intend to rely solely on hash value comparisons, but intends to utilize

24       them in order to assist with identifying relevant evidence. The use of this

25       search method is intended to narrow the search. A search of known hash

26       values, however, will not be used exclusively, because I know that when

27       previously identified images of child pornography are found on a target's

28       computer, typically there are many more images of child pornography

depicting unknown child victims. Using a hash value search method exclusively would not uncover these images of unknown child victims as well as other evidence authorized by this warrant and described in Attachment B.

d. Opening Container Files, Encrypted Volumes, Embedded Files: I know that relevant data may be compressed, encrypted, or otherwise embedded in other files or volumes. It is often not possible through any automated process to examine the contents of such containers without opening them, just as it is not possible to examine the contents of a locked safe without first opening the safe. In the event that compressed, encrypted, or otherwise embedded files or volumes may exist on the seized items, I intend to use sophisticated forensic tools to attempt to open any such container files that may reasonably contain evidence of child pornography.

e. File Header / Extension Checks: I know that individuals involved in illegal activities on a computer often change the extension of a file (such as .jpg) to some other incompatible extension (such as .txt) in order to disguise files from casual observers. The extension of a file, however, is not necessarily linked to the "header" of a file, which is a unique marking imbedded automatically in many types of files. By comparing the extension of a file with the "header information" of a file, it is possible to detect attempts to disguise evidence of illegal activities. Such a comparison can be made in an automated process by computer forensic tools. I intend to run an automated header comparison to detect such efforts, and intend to review any such files that reasonably may contain evidence of child pornography.

f. Thumbnail / Image Views: Although hash value comparisons can positively identify known child pornography depictions, a negative hash value comparison does not exclude an image from suspicion. There is no

41

known alternative for visually inspecting each image file. I therefore intend to examine at least a thumbnail image of each image file on the digital media whether "live," "data carved," or identified by header.

g. <u>Registry / Log File Checks</u>: I know that it is necessary in any criminal case to establish not only that a crime has occurred, but also to establish what person committed that crime. Operating systems and computer programs often maintain various administrative files such as logs that contain information about user activities at certain times. In the Windows operating system, for example, some of these files are collectively referred to as "the registry". Such files contain specific information about users, often including email addresses used, passwords stored, and programs executed by a particular user. These files may also contain evidence regarding storage devices that have been connected to a computer at some time. Multiple backup copies of such files may exist on a single computer. I intend to examine these files to attempt to establish the identity of any user involved in the receipt, possession, distribution, and transportation of child pornography, and to establish methods (such as software used) and dates of this activity.

h. <u>Metadata / Alternative Data Streams</u>: I know that many file types, operating systems, and file systems have mechanisms for storing information that is not immediately visible to the end user without some effort. Metadata, for example, is data contained in a file that is not usually associated with the content of a file, but is often associated with the properties of the application or device that created that file. For example, a digital camera photograph often has hidden data that contains information identifying the camera that manufactured it, and the date the image was taken. Some file systems for computers also permit the storage of alternate data streams, whereby a file such as a text file may hide an

image file that would not be immediately visible to an end user without some action taken. I know that both metadata and alternative data streams may contain information that may be relevant to child pornography offenses. Metadata and alternative data streams are often identified and processed automatically by computer forensic utilities. I intend to review any such data that is flagged by any process above as being relevant to the receipt, possession, distribution, and transportation of child pornography.

90. With rare exception, the above-listed search techniques will not be performed on original digital evidence. Instead, I know that the first priority of a digital evidence forensic examination is the preservation of all data seized. As such, original digital media will be, wherever possible, copied, or "imaged," prior to the start of any search for evidence. The copy will be authenticated digitally as described in the paragraph below.

91. I know that a digital forensic image is the best possible copy that can be obtained for a piece of digital media. Forensic imaging tools make an exact copy of every accessible piece of data on the original digital media. In general, the data contained on the original media is run through a hashing algorithm as described above, and a hash value for the entire device is generated. Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to insure the copy is an exact duplicate of the original. Upon the completion of the search processes described above, which are performed on the image of the hard drive, the hash algorithm is again run on the image copy to insure no alterations of the data occurred during the examination process.

92. In the event that a piece of digital media is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible, not to exceed 120 days absent further court authorization.

93. A 120-day review window is requested due to the delay that may be caused for several reasons. First, the volume of evidence seized in these cases can be immense. Your affiant is aware of cases in which individuals have possessed more than 100,000 images of child pornography on their computer, multiple computers and hard drives, or dozens of storage media upon which contraband images were found. Second, there is a limited pool of personnel capable of conducting a forensic examination consistent with the review protocols outlined herein. Consequently, a complete review of any seized items may not be possible in less time.

94. I also hereby request judicial authorization to retain copies of all seized storage media after the review is complete. Criminal Procedure Rule 41 specifically states "The officer may retain a copy of the electronically stored information that was seized or copied." Fed. R. Crim. P. 41 (f)(1)(B).

95. That judicial authorization is justified in this case in part because:

   a. Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media may be required to prove these facts and the investigator may retain a copy of seized or electronically stored information pursuant to Fed. R. Crim. P. 41(f)(1)(B).

   b. Returning the original storage medium to its owner will not allow for the preservation of that evidence. Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

   c. Because the investigation is not yet complete, it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used. That evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Those defendants might be entitled to a copy of the complete

storage media in discovery. Retention of a complete image assures that it will be available to all parties, including those known now and those later identified. Specifically in this case, based on the nature of P2P file sharing, forensic analysis may identify the user names and screen names of those distributing child pornography to the user of the target computer(s).

    d. The act of destroying or returning storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to him. Maintaining a copy of the storage medium would permit the government, through an additional warrant if necessary, to investigate such a claim.

    e. Similarly, should a defendant suggest an explanation for the presence of evidence on storage medium or some defense, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage medium with that explanation or defense in mind. This may require an additional examination of the storage medium for evidence that is described in Attachment B but was not properly identified and segregated previously.

96. I have not attempted to acquire the sought after material through any other investigative or judicial process.

**Review Protocol**

97. Contextual evidence that establishes how computers were used, the purpose of their use, and who used them is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, such evidence will be searched for and seized in order to understand the evidence described in Attachment B and is included within the scope of this warrant.

1   98. Although it is not possible to accurately predict the exact composition of the review

2       team, given the very limited computer forensic examination resources available at

3       present, it is possible that the team may include one or more agents (myself

4       included), computer specialists, analysts, and/or attorneys including members of the

5       investigative team. The team will not necessarily consist only of persons with those

6       job descriptions, and by referencing those job descriptions, I do not intend to

7       represent anything about the manner in which the team will conduct its review. It

8       is also possible that the review "team" will consist of a single person.

9

10  ## Conclusion

11  99. Based upon the above information, there is probable cause to believe that 18 U.S.C.

12      Sections  2252 (a)(1), (a)(2), and (a)(4)(B), which, among other things, make it a

13      federal crime for any person to knowingly possess, receive, or attempt to transport

14      visual depictions of minors engaged in sexually explicit conduct, have been violated,

15      and that property, evidence, fruits and instrumentalities of these offenses, more

16      fully described in Attachment B of this Affidavit, are located at the SUBJECT

17      PREMISES. This Affiant requests authority to seize such material.

18  100.   Based upon the foregoing, this Affiant respectfully requests that this Court issue

19      a search warrant for the SUBJECT PREMISES, more particularly described in

20      Attachment A, authorizing the seizure of the items described in Attachment B.

21      ///

22      ///

23      ///

24      ///

25      ///

26      ///

27      ///

28      ///

1    101.    The United States requests that the Court order this search warrant and search

2      warrant affidavit be kept under seal until further order of the Court, with the

3      exception that a copy of the search warrant will be left at the scene of the search.

4      Without such an order, individuals may conceal, damage, or destroy evidence

5      sought by this search warrant prior to its execution.

6

7

8

9                                RYAN SMITH
                               Special Deputy United States Marshal

10                                Sacramento ICAC Task Force

Approved as to form.

11

12

13

KYLE REARDON

14 Assistant United States Attorney

15

Subscribed and sworn to before

16 me this _2 3_ day of June 2014

17

18

19

KENDALL J. NEWMAN

20 United States Magistrate Judge
Eastern District of California

21 Sacramento, California

22

23

24

25

26

27

28

1

2

## Attachment A

3    The property to be searched is more fully described as follows:

4

5    **4901 Little Oak Lane, Apartment #185, Sacramento, CA  95841**, in the County of

6    Sacramento, is located within the Sienna Vista Apartments. The exterior of the apartments

7    are tan stucco with white trim. The roof is a dark brown composition shingle. The numbers

8    184 - 187 are posted on a sign attached to the North side of the building in black numbers

9    with a white background. Apartment #185 is located upstairs and the front door faces South.

10   There is a number "185" in white numbers on a sign with a green background in the center of

11   the door.  The front door is brown.

12   The property to be searched includes all rooms, attics, basements, and all other parts

13   therein, and surrounding grounds, garages, storage rooms, or outbuildings of any kind,

14   attached or unattached, located on the premises at **4901 Little Oak Lane, Apartment**

15   **#185, Sacramento, CA 95841.**   The search of vehicles located at or near the residence

16   which fall under the dominion and control of the person or persons associated with said

17   residence.

1
2

**Attachment B**

**Items to Be Seized**

3
4      The following items, images, documents, communications, records, materials,
5  and information are to be seized wherever they may be stored or found at the location
6  to be searched and in any form that they may be stored or found:

7      1. Any child pornography or visual depictions of minors engaged in sexually
8         explicit conduct in any form;

9      2. Any child erotica;

10     3. Any information pertaining to any individual's interest in child pornography,
11        visual depictions of minors engaged in sexually explicit conduct, or erotica;

12     4. Any items, images, documents, communications, records, and information
13        related to the distribution, receipt or possession of child pornography or visual
14        depictions of minors engaged in sexually explicit conduct;

15     5. All screen names, user names, and true names of others who may have operated
16        as the source of child pornography or visual depictions of minors engaged in
17        sexually explicit conduct, in any format, downloaded and possessed by the target
18        computer(s);

19     6. Any items, images, documents, communications, records, and information
20        pertaining to the possession, receipt, transmission, sale, purchase, trade, or
21        distribution of child pornography or visual depictions of minors engaged in
22        sexually explicit conduct that affected or were transmitted or received via
23        computer, some other facility or means of interstate or foreign commerce,
24        common carrier, or the U.S. mail, including:

25
26        a. Envelopes, letters, and other correspondence including, electronic mail,
27           chat logs, and electronic or other instant messages, establishing
28           possession, access to, affect on, or transmission through interstate or

AFFIDAVIT FOR SEARCH WARRANT                    49

foreign commerce, including by United States mail or via computer, of child pornography or visual depictions of minors engaged in sexually explicit conduct;

b. Books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind affecting interstate or foreign commerce or involving the transmission via interstate or foreign commerce, including by U.S. mail or by computer, of any child pornography or visual depiction of minors engaged in sexually explicit conduct;

c. Credit card information, including bills and payment information, regarding Internet service; purchase of computer hardware, software, or storage media; purchase of or payment for memberships to web sites; and possession, receipt, sale, purchase, trade, transportation, or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct;

d. Records evidencing occupancy or ownership of the premises described above, including utility/telephone bills or addressed correspondence; and

e. Records or other items that indicate ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes.

7. For any computer hard drive, cellular telephone/hybrid, or other electronic media (hereinafter "COMPUTER") found to contain information otherwise called for by this warrant:

a. Evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, viewed, or deleted, such as logs, registry entries, saved user names and passwords, documents, and browsing history, to include bookmarked sites;

1       b. Evidence of malicious software ("malware");

2       c. Evidence of the lack of such malicious software;

3       d. Evidence of the attachment to the COMPUTER of other storage devices,

4           disks, CD-ROMS, or similar containers for electronic evidence;

5       e. Evidence of the times the COMPUTER was used;

6       f. Passwords, encryption keys, and other access devices that may be

7           necessary to access the COMPUTER;

8       g. Evidence identifying the location from which images of child pornography

9           were downloaded, including date and time of such downloads;

10      h. Evidence identifying whether image and/or video files containing child

11          pornography were ever viewed, to include date and time of such viewing;

12      i. Evidence identifying whether images and/or videos files were deleted, to

13          include date and time of deletion;

14      j. Evidence relevant to the creation dates of all visual depictions of minors

15          engaged in sexually explicit conduct, to include evidence derived from

16          metadata obtained from child pornographic videos and images;

17      k. Contents of volatile memory related to computers and other digital

18          communication devices that would tend to show the current and recent

19          use of the computer, use of encryption, use of other communications

20          devices, routes of Internet and other digital communications traffic and

21          passwords, encryption keys or other dynamic details necessary to preserve

22          the true state of running evidence;

23      l. Computer software, hardware or digital contents related to the sharing of

24          Internet access over wired or wireless networks allowing multiple persons

25          to appear on the Internet from the same IP address;

26

27

28

1       m. Documentation and manuals that may be necessary to access the

2          COMPUTER or to conduct a forensic examination of the COMPUTER;

3          and

4       n. Contextual information necessary to understand the evidence described in

5          this attachment.

6       If computers or other digital devices are found in a running state, evidence may

7    be acquired from the devices prior to shutting the devices off.

8    ///

9    ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1

## Attachment C

2 **Protocol for Search and Seizure of Computers, Electronic Storage Devices and**

3 **Any Computer/Electronic Storage Media**

4 **(Collectively "Computer and Electronic Media")**

5 1. If agents executing the search warrant conclude that it would be impractical to

6 search the computer and electronic media on-site for the evidence, contraband,

7 fruits of crime and instrumentalities specified in the warrant, agents will seize the

8 same and conduct an off-site search of the same.

9 2. Any search of computers and electronic media, on site or off, will be performed by a

10 review team which may include agents, computer specialists, analysts, and/or

11 attorneys and personnel presently involved in the investigation or otherwise, or

12 any combination thereof (the "review team"). Original computer and electronic

13 media will be, wherever possible, copied, or imaged, prior to the start of any search

14 for evidence. The review team conducting the search will follow a protocol designed

15 to uncover the information permitted by the terms of the warrant as set forth in

16 attachment B.

17 3. If computer and electronic media are taken off site, the search for information

18 authorized by the warrant will be completed within 120 days, unless an extension of

19 time is otherwise authorized by the court.

20 4. Unless otherwise permitted by the court or by the plain view doctrine of the Fourth

21 Amendment, all information not authorized to be seized by the warrant will either

22 be destroyed or, if it may be lawfully possessed, returned to its owner(s) along with

23 all devices initially seized.

24 5. Notwithstanding the foregoing, if devices are evidence in and of themselves, or are

25 subject to forfeiture as contraband, fruits or instrumentalities of the crimes set forth

26 in the warrant, the government may retain the devices (and any software and data

27 therein) in their original seized condition.

28

6.  In addition, the review team will make one complete copy of all seized computer and electronic media.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///